And that brings us to our third case of the day. Let me just check with the panel. Is the panel okay to proceed or would the panel like a little break? Judge Anderson's okay. I'm all right. All right, very good. So then that brings us to our Tauga County Emergency Management Communication District, Calhoun County 911 District v. Federal Communications Commission. And we will begin with Mr. Driver. Thank you, Your Honor, and may it please the court. My name is Christopher Driver, and I represent the petitioners for Emergency Communications District in Alabama. The Supreme Court has said, both in the administrative law and the preemption context, that Congress does not, quote, hide elephants in mouse holes. However, the FCC order that the petitioners are challenging attempts to do exactly that. It expansively interprets a 9-1-1 Improvement Act. That interpretation is unsupported by the statutory text, it ignores federalism concerns, and it's based on a faulty conception of statutory purpose. This court should not grant that interpretation deference, and it should find that the FCC's order is arbitrary, capricious, and contrary to law. Counsel, this is Robin Rosenbaum. Let me ask you a question about the purpose of the statute. Um, the provision that we're talking about has parity in its name. Um, and first of all, would you agree with me that, that it seems as though Congress was concerned about putting the VOIP technology on an equal footing with those giving it parity with the TDM technology? Would you agree with that? Yes, Your Honor, and parity actually goes to more issues than the 9-1-1 issue. I believe the parity issue is focused more on different aspects of the statute, such as interconnection rates and some of the more technical telephone-to-telephone company issues involved in connecting 9-1-1 calls to 9-1-1 call centers. And so parity is an issue that the statute dealt with, and it certainly affects somewhat the interpretation of the applicable sentence here, the relevant sentence here. However, the plain text of the statute is really the guiding principle here and should not be overridden by broader notions of parity. Because the basic question that this court is asking is a statutory interpretation question, and specifically, and under Chevron Step 1, the court is asking whether the phrase fee or charge means the base or nominal 9-1-1 fee, as the districts argue it plainly does, or whether, according to the SEC... Counsel, I'm so sorry, counsel. This is Robin Rosenbaum. I dropped out from right after I asked you the question until now, and I apologize for that. But let me ask the courtroom deputy, would you please add back the time, add back two minutes? And I'm sorry, Mr. Driver, but if you wouldn't mind addressing the question that I started to ask. I think you had said that you agreed that the purpose was parity, and then you had said, but it was parity in different ways, and that's where I dropped out, and I apologize. Yes, Your Honor. I just want to confirm that you're able to hear me now. I can hear you. I apologize. I think it was just some kind of glitch that dropped me off the phone completely. Okay. Yes, Your Honor. To the issue of parity, the statute certainly does discuss parity, and it does so in different ways. And the primary way it talks about is interconnection and the way that telephone companies connect 9-1-1 calls to 9-1-1 call centers, and it discusses parity in more than just the 9-1-1 fee context. And so, certainly, parity is an issue in the interpretation of this statute, but parity affects more than the single sentence we're interpreting here. And importantly, parity should not override, or broad notions of parity should not override the plain text of the statute. I agree with that, but let me ask you this. With respect to parity, how would there be parity if, for example, the districts could charge 4, 5, 6, 100 times as much for what is essentially the same service in total collection charges to voice technology as they do to TDM technology? How is there parity there? Well, Your Honor, so the plain text of the statute does not support the FCC's interpretation, and the FCC's interpretation, I think, is based on the concern that you're raising in that voice is going to be some type of cash cow for these 9-1-1 their 9-1-1 funding statutes to largely voice. And I'm sorry to interrupt, but it doesn't really matter whether it's the norm or not. It's certainly possible under the interpretation you're urging. And if you look at—let's get back to the language, because I think that's where you were going. My concern is that the proposed interpretation of the language that you suggest seems to me to require us to read out of the statute that last line where it says the amount of any such. Because otherwise you could just say the fee or charge may not exceed the fee or charge applicable to the same class of subscribers. But instead it says the fee or charge may not exceed the amount of any such fee or charge. And there's another part where it talks about the collection. So to me it seems pretty clear that that language, and particularly when we look at it in the context of the entire statute, which clearly appears to me to require parity, is talking about the total amount charged for the number of simultaneous lines that can The word amount of or the phrase amount of does not give meaning to fee or charge. Rather it's the other way around. Fee and charge really give meaning to amount of. And so the FCC focused on the word amount of in the order itself. But amount of is more defined by the prepositional phrase that follows, of any such fee or charge. And so really this is more of an issue of what charge means rather than amount of. And so can I? I'm sorry. No, no. Go ahead, Judge Rosenbaum. I apologize. That's okay. I was going to ask you, so are you then, under your interpretation, do you concede that the amount of any doesn't bear any independent weight? It's just surplusage there? I mean, what is the difference between saying the fee or charge may not exceed the or the fee or charge may not exceed any such fee or charge, under your interpretation? Or is there not? Your Honor, I would not describe amount of as surplusage. I would say that it's descriptive language just indicating that the fee or charge is usually a monetary amount. That it is a number that is typically imposed by the state. And earlier you raised the issue of collection and the SEC's focus on collection. Well, importantly, the statutory language here discusses both the imposition and collection. So in the first sentence of subsection F1, it says, no commission regulation, I'm paraphrasing a little bit, no commission regulation or order shall prevent the imposition and collection of a fee or charge. And really the last sentence here that we're interpreting discusses the imposition of the 9-1-1 fee. Collection is really the means of going out and getting the money that subscribers are paying and remitting that to the 9-1-1 district. And so the SEC's focus on the term collection really takes collection out of context. Counsel, I want to focus on fee or charge as you've asked us to do. So as I understand the definition from the same dictionaries that you all seem to be using, a fee is defined as a sum paid or charged for a service and a charge is defined as the price demanded for something. Now that would seem to me to incorporate both a numerator and denominator. The numerator being the sum paid, the price, and the denominator being the service or something. And if we're talking about parity, if we're talking about one not exceeding the other, whether you'd phrase it as the amount of or just the fee or charge, don't both have to be the same? Doesn't the something or the service have to be the same? No, Your Honor. And I would point to the language in the statute discussing the class of subscribers. The statutory language... Well, Counsel, here's my issue. Because the way you've answered Judge Rosenbaum is to say, and the way that I read your brief is to say, this rises or falls on what fee or service means. And fee or service is the price. And as long as the price is the same for a class or for anybody, it's the same. But I'm asking you about what the meaning of those terms are. And I'm looking at the same dictionaries that you have cited both below and to the agency and to here. And those dictionaries seem to suggest that the price, that there's two components of fee or service. Wouldn't both have to be the same? No, Your Honor, they don't. And certainly, perhaps if fee or charge was isolated from the rest of the context of the statute, perhaps an interpretation or a definition of those that included the multiplier, here what the SEC imposed in simultaneous call capacity, then perhaps those in the context of the statute as a whole, and specifically the applicable to the same class of subscribers language... Right. Explain to me how that changes anything. If the price for the class of subscribers for one class has to be the same for the other, then doesn't the for the service or for something also have to be the same between classes of subscribers? In other words, if the price is $1 for each access line for a business, doesn't it have to be the same whether the business uses VOIP or regular old, you know, wire service? No, Your Honor. And I think that that relies on the assumption that there is sort of a shared measurement of service between voice and... Well, that's a different issue. That may be true and that may be problematic in terms of the technology. But in terms of the plain language, which is all that you told us to focus on, how is what I said not perfectly consistent with the plain language of the statute? Your Honor, because I think the FCC's interpretation focuses on the total amount paid and it's not necessarily dependent on the particular measurement. Your interpretation may be true if the FCC's orders that states you can use any type of but what the FCC has done is impose a simultaneous call capacity requirement. And so the FCC actually takes an additional step from what you're suggesting, Judge Luck, and that is not only do the units of measurement have to be the same, but they also have to be this unit of measurement that we, the FCC, are imposing on all states in that simultaneous call capacity. Counsel, this is Judge Anderson. I do not read the FCC that way. It seems to me they do say that the outbound capacity, outbound calling capacity, is the most reasonable. And that's the one they are tending to use. But it seemed to me they leave open to the states that set these fees to use other measurements if they want to. And, Your Honor, I would point you to paragraph 33 of the FCC's order where earlier in its order it seems to give that concession, but it takes that away in paragraph 33. It says states are free to assess voice 9-1-1 fees on a per telephone number basis, but if the fee billing framework results in a voice subscriber paying a higher total 9-1-1 fee than a traditional telecommunication service subscriber for the same outbound 9-1-1 calling capacity, that framework would violate the voice 9-1-1 fee parity provision. And so, Your Honor, paragraph 33 makes clear that states, while they may facially impose other units of measurement, those units of measurement are still subject to the FCC's one-size-fits-all federally mandated standard of 9-1-1, excuse me, of on paragraph 33. I was focusing on 18 and several other places, but assume that, I'm not sure that, or in any event, that raises in my mind this question. It seems to me that the outbound calling capacity issue is not at issue in the Alabama case, and I'm wondering if we should address any issue that's not relevant to the Alabama cases. Your Honor, what the 9-1-1 districts here are asking the court to do is to set aside the FCC's order, and the FCC's order is necessarily premised on imposing a simultaneous call states' rights to craft their own 9-1-1 funding statutes. Let me ask you this. Let me ask you, does the current Alabama fee schedule rely on anything other than outbound calling capacity? I think it largely relies on outbound call capacity. Why is that issue relevant to the Alabama case? Your Honor, we are suing under a prior statute that was repealed, and so the effective timeframe here is, I think, prior to 2013, where a previous statute was in play there. Thank you, Your Honors. Before you sit down, counsel, let me ask you one question. So is your point that if you were to prevail, you would still be entitled to damages or monies that hadn't been paid in that pre-amendment period? Yes, Your Honor. So this case comes before the court from the FCC, which got the case from a primary jurisdiction referral from the Northern District of Alabama. And so if we prevail and disappeal, we will maybe a little ways down the road, but we will eventually get back to the Yes, we would hope to recover damages after we prove our case in the district court. All right. Thank you very much, counsel. Okay. We will hear next from Mr. Dunn. Thank you, Your Honors. This is Matthew Dunn, appearing on behalf of the United States and the Federal Communications Commission. So this case, as we've been already discussing, hinges on the interpretation of a statute where clearly stepped in to regulate state 911 fees and required parity between fees for VoIP and traditional phone services. That makes sense because accepting a VoIP call places no greater burden on a 911 service than does accepting a traditional phone call. So the only dispute here is about the scope of preemption. And I would suggest to you that the agency's interpretation, regardless of the level of deference you apply, is the only reasonable interpretation here. I think, Your Honors, I've already been hitting on this some, but petitioner's proffered interpretation serves no purpose as far as we can tell. If you'll permit an analogy, suppose Congress were concerned about the price of apples and said the fee for apples charged to Group A must be the same as the fee charged to Group B. And then imagine that an apple seller said, oh, I understand, sure, I'm going to charge a dollar, a dollar for apple to Group A and a dollar per bushel of apples to Group B. I don't think anyone would argue that that's a reasonable interpretation of the statute. But counsel, my concern, and it may be an irrelevant concern, and I want you to tell me if it's irrelevant, and it may be because of our standard overview, but how can you make this argument, which I thought you threaded the needle very finely in your brief and now less so in oral argument, when the agency itself conceded that it was a, the districts gave a reasonable interpretation of the statute? I don't think that the agency found that the petitioner's proffered reading is reasonable. I think what the agency said in paragraph 15 of the order is that the language, and here we're just talking about fee or charge, I think that language, on its face sort of in a context-free vacuum might have one of two meanings. Doesn't it, isn't the agency's determination or finding that there wasn't ambiguity mean that there are at least two reasonable interpretations of the same language? And while first I would say, I think Your Honor is on the right track when you say you're not sure that it amounts to much, because I think you're going to reach the same conclusion in either case. I think here it also- But let me drill down, counsel, sorry, I apologize for interrupting, but let me drill down even more specifically. Does that bind me in any way whatsoever in my determination on step one of Chevron, that the agency's determination of ambiguity? I don't think so. The court is free to disagree and say, in fact, we find there's only one meaning and the agency got it right. Is that because it's a de novo review for us on step one? That's right. I think that courts usually analyze it in that way. The court is always tasked with interpreting the statute. In step one, you're going to do your best job to interpret the statute. And if you find there's an ambiguity, then you would defer to the agency's interpretation. In other words, we're in the same position the agency was when they were looking at it in the first instance. When you're at Chevron one, I think that's right. That's right. Now, Chevron courts, and I will say somewhat in how broadly they interpret step one, sometimes it's purely linguistic interpretation. And sometimes it's using all the traditional tools of statutory interpretation, as Chevron says. I think what petitioners would like to do is not permissible. They would like to say, this is step one. I'd like to open the door just wide enough to let in a presumption against preemption and then slam the door shut before any of the other interpretive tools come into play. So they have a very restricted view of step one here. I think either the court is interpreting as best it can using all the tools of statutory interpretation, including, as Judge Rosenbaum was saying, the congressional purpose, or it's purely a linguistic issue. Just can I tell what the statute means just on its face? And if not, then I'm going to look more broadly and also consider the agency's interpretation. So I think it sounds like your honors understand already my point about the numerator and denominator and that those seem to be linked together. I think there was some question about whether or not states are free to charge based on some unit other than outbound calling capacity. It's true that they are able to, absolutely, as Judge Anderson was pointing out, that the order, at many points, reserves that right to state. But it is also true that what at the end of the day has to be true is that if someone, say, were to switch from traditional to VOIP service and keep exactly the same service package, their fees should not go up. So if they have the same outbound calling capacity, they shouldn't be charged anymore for VOIP. Those are the notes I had on your honors' questions, and I don't want to use my time if I don't need it. Are there other questions you'd like me to address? I just want to be clear, and this is Judge Luck, as I read, for instance, page 18, but I know it's at other places too, the FEC, quote, rejected the idea proposed by some commentators that our decision here will prevent states from charging 911 fees to VOIP subscribers on a per telephone number basis or any other basis. In other words, the FEC is not dictating what the basis has to be. It's simply saying that the denominator has to be the same whatever you choose. That's right. That's right. Do I understand that correctly? You do, yes. If you as a state decide phone numbers is how you want to go, you're welcome to charge based on phone numbers. Right. In other words, if I don't want to do outbound capacity, as is what seems to be what telephone numbers, no matter whether they can dial 911 or not, I'm charging you 10, and that's true for VIOP, and it's true for business using hardwires and it's for cellular for any one of them. It's all the same, right? That's right. When you're testing whether or not a law would be preempted, I think you would need to take a specific case and say, let's say I have 10 phone numbers and 10 outbound calling lines with VOIP, and then I switch to TDM or vice versa, would my rate stay the same? I think that's the easiest way to put it. But a state is free to charge based on the phone numbers instead of the outbound calling capacity. That's absolutely right. And just to kind of close the loop on this, the reason that outbound calling capacity makes so much sense is, of course, that is a reasonable proxy for the burden that might be placed on a 911 service since they have to accept calls. The question is, how many calls can a given customer place? So that's why it makes sense in many instances, but it's not required by the agency's order. So are there any further questions? Thank you. We just asked that you deny the petition for review. Thank you, counsel. All right. Mr. Angstreich. Thank you, Your Honors. This is Scott Angstreich. I represent the AT&T intervenors, and I'm presenting argument on behalf of the other intervenors in support of the commission. I'd like to start where I think Judge Anderson was asking about, well, is anything outside the Alabama case important here? And I think it's important to recognize that there were three different primary jurisdiction referrals, also from a state court in Florida and a state court in Pennsylvania. The plaintiff in those cases elected not to participate at the FCC proceeding. They elected not to appeal this decision. As we explained in our brief, there is some cross-representation of parties. But issues from all of those cases are relevant, and that's why the FCC went on to discuss discriminatory caps, which is not a question issue in the Alabama case, but is presented in some of those other cases. And notably, it's something that the Congress, in a statute where they were trying to ensure that VoIP providers would be competing in parity with traditional telephone service, would be unconcerned about a state that decided that traditional customers would never pay more than 50 charges, no matter how much service they bought, but VoIP customers could pay potentially an unlimited number of charges. Looking at paragraph 33, I think that final sentence in Judge Locke, you were getting it in context, what it is saying is that if a state wants to assess 9-1-1 fees on VoIP customers by telephone number, then it has to do the same thing for traditional service customers. And then when somebody switches, then there would not be any kind of disparity as between the two customers. But of course, state after state, including Alabama, have chosen to adopt concurrent call capacity as the uniform metric. And notably, Alabama's had this in place for eight plus years. Not a single participant in the parade of horribles that the district has managed to show up in Alabama during that time. And then Judge Locke, I do agree with Mr. Dunn that you review the interpretation question de court can certainly conclude that the statute is unambiguous, even if it thinks the FCC concluded otherwise. But I don't think you can read the reference to ambiguity in the FCC's decision to suggest that it concluded that both the district's interpretation and the one the commission adopted were reasonable interpretations. In paragraph 17, the FCC explains that it identifies the best interpretation of the statute. And then when it goes through the text of the statute, it explicitly finds that the district's interpretation is contrary to the letter of the statute. And that's just not language of an agency that believed it was confronting two reasonable interpretations of the statute. If the court has no questions, I'll yield the remainder of my time. All right. Thank you very much, counsel. Mr. Driver. Yes, your honors. I'd like to start with the point that Mr. Engstrache ended with, and that is the perceived ambiguity by the FCC. And ambiguity necessarily requires two reasonable interpretations. The statute is not ambiguous if there's a reasonable interpretation and then other unreasonable, distorted interpretations. And so the FCC necessarily found an ambiguity in paragraph 9 of its order. But counsel, am I allowed to disagree, I guess, is my question. I tend to agree with you. But am I allowed to disagree with their reading, that there are two reasonable interpretations? Yes, your honor. Chevron step one, certainly this is a de novo review. And I think the district's position under Chevron step one was distorted a little bit, but by the other side. And that is, the district certainly wants the court to use all available tools of statutory interpretation. And as our briefing indicates, we believe that the presumption against preemption is one of those. But an improper tool that we believe the FCC used in its order is its conception of statutory purpose, which the FCC hinted at. And the FCC notably used the statutory purpose of the Telecommunications Act of 1996, that is, the consumer adoption of voice, to the detriment of the actual statutory purpose as Congress put in the Act itself. And finally, your honors, this is not an apples-to-apples comparison, as the FCC's interpretation would suggest. VoIP and traditional telephone services have different capabilities that require different treatment at times. And so that is really the reason and the context for certain states adopting different units of measurement here. So we'll ask this court not to grant deference to the FCC's interpretation and to find that the order itself is arbitrary, capricious, and contrary to law. And if there's no other questions, the district will rest their case. All right. Thank you, counsel.